FILED

JUN 21 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHARI S. MARRAZZO,

    Plaintiff,

                                 CV 08-1014-PK

                                 OPINION AND
v.                               ORDER

MICHAEL O. LEAVITT,

    Defendant.

PAPAK, Magistrate Judge:

    Plaintiff Shari Marrazzo brought this action against the Secretary of the Department of Health and Human Services (the "Secretary") on August 28, 2008. Through her complaint, Marrazzo alleges claims of constructive discharge, failure to provide reasonable accommodation, and retaliation in violation of the Rehabilitation Act, of common-law constructive discharge, and of intentional infliction of emotional distress. This court has jurisdiction over Marrazzo's action

Page 1 - OPINION AND ORDER

pursuant to 28 U.S.C. §§ 1331 and 1367(a).

Now before the court is the Secretary's motion (#17) for summary judgment. I have considered the Secretary's motion, all of the pleadings on file, and oral argument on behalf of the parties. For the reason set forth below, the Secretary's motion is granted.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

Marrazzo began working for the Indian Health Service as a full-time permanent clinical nurse at the Warm Springs Health and Wellness Center ("Warm Springs") on June 21, 1998. Marrazzo had previously been employed at Warm Springs as a clinical nurse on a temporary, intermittent basis. In or around 2001, Marrazzo was assigned to be the "team" nurse working with Thomas Creelman, MD. Lorinda Sampson became Marrazzo's direct supervisor at Warm

Springs in June 2003.

In June 2004, Thomas Manning, MD, Warm Springs' clinical director, drafted a memorandum to Sampson to express his concerns regarding Marrazzo's attitude and lack of team spirit. In September 2004, Sampson wrote Marrazzo a "warning letter" regarding certain comments Marrazzo had made in the workplace, comments Sampson characterized as "negative" and "seditious."

On November 24, 2004, Marrazzo received a paper cut which, apparently due to compromise of Marrazzo's lymphatic system following a bout with cancer some years before, resulted in complications, including lymphedema and lymphangitis. In consequence, Marrazzo took medical leave from work from November 24, 2004, until her treating physician released her to return to work on a light-duty basis on January 14, 2005.

On March 10, 2005, Marrazzo's physician released her to work "within pain limits" and "within her own limits" but without other, more specific restrictions. At that time, Sampson issued Marrazzo a "limited duties schedule," including limited use of her right hand and a restriction from administering injections. It appears that these limitations on Marrazzo's work duties may not have been newly imposed in March, but rather may have been informally in place since Marrazzo's return to work in January 2005, and only formally imposed in March.

On March 21, 2005, Dr, Manning, the clinic director, drafted a memorandum to Dr. Creelman, the physician to whose team Marrazzo was assigned, to express his concerns regarding the fact that Marrazzo was complaining about her limited duties schedule outside the chain of command. On March 24, 2005, Marrazzo received an official written reprimand from Sampson, for failure to adhere to certain directives regarding her administrative duties.

On the basis of evidence that Marrazzo was not adhering to the restrictions imposed by her limited duties schedule – in particular, it appears that Marrazzo routinely and openly ignored the restriction on administering injections – in May 2005 Sampson proposed that Marrazzo be suspended for three days.  Marrazzo was given an opportunity to respond to Sampson's proposal. In early June 2005, Marrazzo objected in writing to the proposal and indicated her disagreement with the restrictions in her limited duty schedule.

On June 8, 2005, Marrazzo's treating physician excused Marrazzo from work for 30 days , indicating that upon her return to work she should be restricted to four hours work per day for an unspecified period of time.  On June 20, 2005 – apparently while Marrazzo was out of work pursuant to her physician's note – Sampson sent Marrazzo a letter clarifying the limited duties schedule previously imposed, in which she reaffirmed that Marrazzo was restricted from administering injections or dressing changes.

On August 9, 2005, Marrazzo's physician cleared her to return to work effective August 10, 2005, with the restrictions that she was to wear a compression sleeve on her right arm and to work only 4 hours per day.  Marrazzo returned to work on August 10, and was assigned a 10 a.m. to 7 p.m. "walk in/triage" shift.  On August 12, 2005, Marrazzo requested permission to work in a side job in a home hospice setting, but Warm Springs did not act on her request until late September.

On August 23, 2005, Marrazzo's physician cleared her to return to work with the restrictions that she was to wear a compression sleeve on her right arm and to work alternating 8- and 4-hour shifts.  At some time during the next few days, Sampson advised Marrazzo that the restrictions on her duties were lifted, and that she would be working alternating 8- and 4- hour

shifts in walk in/triage.

On September 6, 2005, Warm Springs deputy director Gewndolyn Steelman elected to adopt Sampson's recommendation that Marrazzo receive a 3-day suspension from work for failure to adhere to directives from her supervisors (specifically, for administering shots and otherwise failing to comply with her light duty restrictions in April and May 2005).

By September 16, 2005, communication between Sampson and Marrazzo had become so difficult that, according to Sampson's testimony, it was necessary for a third person to be present any time Sampson needed to communicate with Marrazzo regarding Marrazzo's employment duties. On September 16, 2005, after Sampson received an email message from Marrazzo regarding Marrazzo's schedule that had been copied to Marrazzo's attorney, Sampson, according to her own testimony, requested that a mediator be assigned to improve communications between her and Marrazzo. Sampson testified that she was later informed that Marrazzo had opted to initiate an EEO complaint rather than submit to mediation. (According to Marrazzo's testimony, it was Marrazzo who requested mediation and Sampson who rejected the idea.) It is undisputed that this was the first time anyone at Warm Springs learned that Marrazzo planned to file an EEO complaint.

It appears that in September 2005, Marrazzo was written up for failing to adhere to the work hours limitations set forth in her schedule pursuant to her physician's note. Marrazzo asserts that the letter proposed a ten-day suspension; it does not appear that the suspension was ever implemented.

On September 28, 2005, Sampson denied Marrazzo's request for permission to perform outside nursing work in a home hospice setting on the stated grounds that doing so might cause

her to work more hours than her physician's note would have permitted.[1]

On September 29, 2005, Marrazzo's physician released her to return to work without any restrictions. Sampson responded by assigning Marrazzo to full-time shifts and full nursing duties.

On October 7, 2005, clinic director Dr. Manning (who had received complaints from Dr. Creelman regarding Marrazzo's "inconsistency" in performing her functions as "team" nurse) sent a memorandum to Sampson requesting that a nurse other than Marrazzo be permanently assigned as Dr. Creelman's team nurse. Sampson responded by reassigning Marrazzo to walk in nurse with "cancer registry and committee" functions. The Secretary provides evidence, in particular Sampson's declaration, that a nurse's frequent absences can be disruptive of a patient's care in a "designated provider" clinic like Dr. Creelman's, whereas providing alternate nurse coverage in a walk-in clinic setting is less likely to cause such disruption.

On October 19, 2005, Marrazzo initiated contact for the first time with the Indian Health Service Office of Diversity Management and Equal Employment Opportunity (the "DMEEO") in connection with her intention to file a complaint against Warm Springs.

On October 20, 2005, Marrazzo's physician discharged Marrazzo from care related to her lymphedema and indicated that she had achieved maximal recovery.

Marrazzo renewed her request for permission to perform paid nursing work outside her Warm Springs job on October 27, 2005. Sampson denied the request in November 2005, on the grounds that Marrazzo had not demonstrated the ability to work full "80 hour tours" since her return to work, even in the absence of outside work responsibilities. The Secretary offers

---

[1] Marrazzo's employment contract apparently required her to obtain permission from her employer before performing outside work for any other employer.

Page 6 - OPINION AND ORDER

Sampson's testimony that even following her return to work, Marrazzo used sick leave frequently and was frequently absent from work, and that Sampson did not feel she could grant Marrazzo the privilege of working outside the clinic until she had shown herself able to work full time at the clinic with "relatively minimal use of sick leave or other leave" for a six-month period.

In December 2005, Marrazzo received an annual performance evaluation from Sampson in which she received an "acceptable" rating in all categories. Some of Sampson's comments regarding Marrazzo's work were positive.

On December 19, 2005, Marrazzo filed a formal EEO complaint against Warm Springs, alleging disability discrimination based on her lymphedema and lymphangitis and reprisal for having expressed her intent to file an EEO complaint, purportedly resulting in a hostile work environment since September 2005.

In January 2006, Marrazzo again requested permission to perform outside paid nursing work. Her request was denied. The Secretary offers Sampson's testimony that Marrazzo still had not shown that she could work full time without relying on sick leave at the time the request was denied.

On February 7, 2006, Marrazzo reported to Nancy Collins, Warm Springs' clinical safety officer, that she had been hurt when a physician bumped into her arm. She further reported to Collins that various members of Warm Springs' staff had "squeezed" her right arm, causing her pain and discomfort. Later that month, Collins recommended that Marrazzo be reassigned to duties in which she would not have direct patient contact, on the ground that it would otherwise be impossible to guarantee that her arm would not suffer reinjury.

On March 7, 2006, Sampson asked Marrazzo to provide documentation of her history of

Page 7 - OPINION AND ORDER

outside work activities by a specified time. The parties dispute whether Marrazzo complied with

Sampson's request. Sampson recommended that Marrazzo be suspended from work for fourteen

days in consequence of her supposed failure to comply, but the suspension recommendation was

not implemented. Specifically, Steelman rejected the suspension because she believed Marrazzo

had complied with Sampson's request, although perhaps not in timely fashion.

On March 9, 2006, Marrazzo failed to report for her shift. The parties dispute whether or

not she called to inform Sampson that she would be absent that day. Sampson charged Marrazzo

with 3 hours and twenty minutes of absence without leave. The parties dispute whether other

nurses received similar discipline for similar infractions.

On May 25, 2006, the office of Workers Compensation Programs decided that Marrazzo's

lymphedema was a compensable workplace injury.

On June 7, 2006, Marrazzo applied for a new position, outside the Warm Springs clinic,

with the Confederated Tribes of Warm Springs (the "Tribes"). In her application, Marrazzo

indicated that she was immediately available for employment, that she had extensive experience

and skills with operating a computer or typewriter keyboard.

On June 28, 2006, Sampson issued a "progress review" of Marrazzo's job performance.

Most of the form was not filled out, but the comments regarding Marrazzo's performance were

mainly positive.

On July 6, 2006, Warm Springs CEO Carol Prevost and deputy director Steelman

presented Marrazzo with a proposed "realignment" of her duties. (Sampson testifies that she was

not involved in the decision to realign Marrazzo's duties.) The stated purpose of the realignment

was to prevent reinjury of Marrazzo's arm by taking her out of direct patient care duties. The

Page 8 - OPINION AND ORDER

following day, Marrazzo's application for employment with the Tribes was accepted.  On July 12,

2006, Marrazzo tendered her resignation to Warm Springs.

The Secretary offers testimonial evidence that Manning, Prevost, Russell (the nurse who

replaced Marrazzo as Dr. Creelman's "team" nurse), Sampson, Steelman, and Wilder (Portland-

area director of the Indian Health Service, who made ultimate decisions on some or all of

Marrazzo's outside work requests) did not regard Marrazzo as disabled.  Indeed, some of these

were aware of Marrazzo's interest in competitive walking and in horse riding, and appear to have

considered her a physically active, even athletic person.

## ANALYSIS

Marrazzo's complaint contains allegations in support of three independent claims for

relief.  In connection with the first claim, for violation of the Rehabilitation Act, Marrazzo alleges

that her rights were violated when the defendant (1) "caus[ed] [her] resignation . . . as a result of

her record of disability and/or perceived disability," (2) "fail[ed] to provide [her] with reasonable

accommodation if it believed she did in fact have a disability," and (3) "retaliat[ed] against [her]

for being disabled and for opposing discrimination on the basis of her disabilities."

In connection with the second claim, for constructive discharge, Marrazzo alleges that the

defendant intentionally created employment conditions so intolerable that any reasonable person

in her position would have resigned.  In connection with the third claim, for intentional infliction

of emotional distress, she alleges that the defendant intentionally created intolerable employment

conditions and did so with the knowledge that such conditions would cause Marrazzo severe

emotional distress.

The Secretary moves for summary judgment as to all three claims.  Marrazzo concedes

that the Secretary's arguments are well taken in connection with the constructive discharge and

intentional infliction claims, and offers no opposition to the Secretary's arguments in connection

with those claims. In addition, she concedes that she was not at any material time actually

disabled. Marrazzo offers argument in opposition to the Secretary's motion only in connection

with her first and third enumerated Rehabilitation Act theories.

I.    **Claims as to Which the Secretary's Motion for Summary Judgment is Unopposed**

Marrazzo's second and third claims for relief are for constructive discharge and for

intentional infliction of emotional distress. As noted above, Marrazzo does not offer argument in

opposition to the Secretary's motion for summary judgment as to these claims. Although it

appears likely in consequence that Marrazzo intends to abandon both claims, because they have

not been formally withdrawn I briefly analyze the merits of each.

A.    **Constructive Discharge**

"Under the constructive discharge doctrine, an employee's reasonable decision to resign

because of unendurable working conditions is assimilated to a formal discharge for remedial

purposes. The inquiry is objective: Did working conditions become so intolerable that a

reasonable person in the employee's position would have felt compelled to resign?" *Poland v.

Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007), *quoting Penn. State Police v. Suders*, 542 U.S.

129, 141 (2004). More specifically, the courts of the Ninth Circuit recognize that constructive

discharge occurs:

> constructive discharge occurs when the working conditions deteriorate, as a result
> of discrimination, to the point that they become sufficiently extraordinary and
> egregious to overcome the normal motivation of a competent, diligent, and
> reasonable employee to remain on the job to earn a livelihood and to serve his or
> her employer.

*Id.,, quoting Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). The *Poland* court

quoted with approval *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996), for the

further proposition that "[a]n employee who quits without giving his employer a reasonable

chance to work out a problem has not been constructively discharged." *Id.* at 1185. Although the

*Poland* court acknowledged that "a determination of constructive discharge is normally a factual

question left to the trier of fact," *id.* at 1184, *citing Watson v. Nationwide Ins. Co.*, 823 F.2d 360,

361 (9th Cir. 1987), it reversed the district court below and found as a matter of law that an

employee was not constructively discharged when he was transferred across the country under

circumstances that required him to live apart from his family, where the transfer did not constitute

a demotion – although it constituted a change from a supervisory to a nonsupervisory position and

closed off the employee's opportunities for subsequent promotion – and the employee initially

accepted the transfer, worked in the new location for five months before deciding to resign, and

worked in the new location for an additional three months before actually resigning. *See id.* at

1185-1186.

Here, it is undisputed that Marrazzo testified under oath that she "still liked [her] job"

prior to learning about the reassignment proposal of July 2006. Moreover, it is undisputed that

Marrazzo resigned at a time when her supervisors at Warm Springs were actively working with

her to resolve the difficulties she was experiencing with the terms and conditions of her

employment. As Marrazzo tacitly concedes, her testimony and other evidence in the record

establish that working conditions at Warm Springs had not become objectively intolerable at the

time she resigned her position, and that Marrazzo elected to qui before giving her employer the

opportunity to correct the problems she was experiencing. Because, in light of her testimony,

Marrazzo was not constructively discharged, the Secretary's motion is granted as to Marrazzo's constructive discharge claim.

### B.    Intentional Infliction of Emotional Distress

The Civil Service Reform Act (the "CSRA") provides that it is a "prohibited personnel practice" for a federal employee with supervisory authority to "discriminate for or against any employee or applicant for employment . . . on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791). . . ." 5 U.S.C. 2302(b)(1)(D). The Ninth Circuit has held that the remedies available under the Civil Service Reform Act preempt state-law tort claims arising out of actions taken in violation of the CSRA. *See Saul v. United States*, 928 F.2d 829, 841-843 (9th Cir. 1991).[2]

Because this court lacks jurisdiction to hear Marrazzo's intentional infliction claim due to preemption by the CSRA, the Secretary's motion is granted as to Marrazzo's claim for intentional infliction of emotional distress.

## II.    Rehabilitation Act Claims

The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in federal employment, as well as in programs conducted by federal agencies or receiving federal financial assistance and in the employment practices of federal contractors. The standards for determining employment discrimination under the Rehabilitation Act are the same as those used in Title I of the Americans with Disabilities Act. *See* 29 U.S.C. § 794(d); *see also, e.g., Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940-941 (9th Cir. 2009).

---

[2] By contrast, the CSRA expressly preserves the availability of government employees' remedies under several antidiscrimination statutes, including section 501 of the Rehabilitation Act. *See* 5 U.S.C. § 2302(d)(4).

Page 12 - OPINION AND ORDER

Through her complaint, Marrazzo asserts three theories that the defendant violated the Rehabilitation Act: (1) that the defendant "caus[ed] [her] resignation . . . as a result of her record of disability and/or perceived disability," (2) that the defendant "fail[ed] to provide [her] with reasonable accommodation if it believed she did in fact have a disability," and (3) that the defendant "retaliat[ed] against [her] for being disabled and for opposing discrimination on the basis of her disabilities."

### A.    "Caused Resignation" Theory

By definition, the theory that the defendant caused Marrazzo to resign in violation of the Rehabilitation Act is a theory of constructive discharge. As discussed above in Section I(A), a claim for constructive discharge does not lie unless "working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland*, 494 F.3d at 1184. Here, Marrazzo's testimony that she enjoyed working at Warm Springs up to the point at which she tendered her resignation forecloses any possibility that a trier of fact could reasonably conclude that working conditions at Warm Springs had become objectively intolerable. The Secretary's motion is therefore granted as to Marrazzo's claim for violation of the Rehabilitation Act to the extent premised on a "caused resignation" theory.

### B.    Reasonable Accommodation Theory

"A failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002), *see also* 28 C.F.R. 35.130(b)(7). However, the courts of the Ninth Circuit recognize that there is

Page 13 - OPINION AND ORDER

no duty to provide reasonable accommodation to an employee who fits the statutory definition of "disabled" by virtue of a history of disability or being regarded as disabled, but has no actual disability. *See Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1232-1233 (9th Cir. 2003) (it "would be a perverse and troubling result" if an employer could be held liable for failing to accommodate a nonexistent disability). Here, Marrazzo concedes that she was not at any material time disabled. In consequence, she cannot prevail on a theory that the Secretary violated the Rehabilitation Act by failing to provide her with any reasonable accommodation. The Secretary's motion is therefore granted as to Marrazzo's claim for violation of the Rehabilitation Act to the extent premised on a "reasonable accommodation" theory.

### C.    Retaliation Theory

As noted above, Marrazzo alleges that the defendant retaliated against her for "being disabled" as well as for "opposing discrimination on the basis of her disabilities." However, it is clear that "being disabled" is not a constitutionally protected "activity" that can form the basis for a retaliation claim. I therefore construe Marrazzo's theory of retaliation for "being disabled" as a claim for disability discrimination in the terms and conditions of her employment, rather than as one for retaliation, and address the construed disability discrimination claim *infra*, in Section II(D). In this Section II(C), I address only Marrazzo's theory that the defendant retaliated against her for "opposing discrimination on the basis of her disabilities."

To make out a *prima facie* case of retaliation under the Rehabilitation Act, a plaintiff must demonstrate that "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-1066 (9th Cir. 2003), *quoting Raad v. Fairbanks*

Page 14 - OPINION AND ORDER

*North Star Borough Sch. Dist.*, 323 F.3d 1185, 1196-97 (9th Cir. 2003). For purposes of a retaliation claim, an adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-1243 (9th Cir. 2000) (citation omitted). "[O]nly non-trivial employment actions that would deter reasonable employees from [engaging in protected activity] will constitute actionable retaliation." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). That is, to constitute an adverse employment action the action must be one that "a reasonable employee would have found [to be] materially adverse." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms"); *see also Crady v. Liberty Nat. Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) ("To qualify as adverse, the action must be "more disruptive than a mere inconvenience or alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.") Potentially adverse employment actions that are not final or lasting are insufficient to constitute actionable adverse actions. *See, e.g., id.* at 930; *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 546 (6th Cir. 1999).

A Rehabilitation Act plaintiff who has stated a *prima facie* claim can survive summary judgment either by producing direct evidence of discrimination or by utilizing the *McDonnell Douglas* burden-shifting framework. *See Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1175-1176 (9th Cir. 1998). Under the *McDonnell Douglas* burden-shifting framework, once the

Page 15 - OPINION AND ORDER

plaintiff has stated a *prima facie* claim of employment discrimination, the burden shifts to the employer to proffer a nondiscriminatory reason for the adverse employment action it imposed, following which the employee, in order to prevail, must establish that the employer's proffered reason was, in fact, pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973).

It is undisputed that on December 19, 2005, Marrazzo filed a formal EEO complaint against Warm Springs, alleging disability discrimination based on her lymphedema and lymphangitis conditions and "reprisal" for having expressed her intent to file an EEO complaint, purportedly resulting in a hostile work environment beginning in September 2005. It is further undisputed that Warm Springs personnel first learned of Marrazzo's intention to file an EEO complaint in September 2005. Consultation with the DMEEO and filing an EEO complaint are each constitutionally protected activities for purposes of Marrazzo's Rehabilitation Act claim.

The universe of potentially adverse employment actions suffered by Marrazzo on or after September 16, 2005, for which there is evidence in the record are: (i) the proposed 10-day suspension of September 2005, which was never implemented, (ii) several denials of Marrazzo's requests to work in an outside setting, (iii) Marrazzo's reassignment off of Dr. Creelman's team to the walk-in clinic in October 2005, (iv) the proposed 14-day suspension of March 2006, which was never implemented, (v) the March 9, 2006, charge of three hours twenty minutes' absence without leave, and (vi) the July 2006 proposal that Marrazzo's duties be "realigned." Of these, the proposed 10-day suspension of September 2005, the proposed 14-day suspension of March 2006, and the July 2006 proposal that Marrazzo's duties be "realigned" cannot constitute adverse employment actions as a matter of law, because none was ever implemented, and therefore none

ever became sufficiently "final or lasting" to support a *prima facie* claim. *Brooks*, 229 F.3d at

930. In addition, the denials of Marrazzo's requests to work in an outside setting and the charge of

three hours twenty minutes' unexcused absence clearly had no material impact upon the terms and

conditions of Marrazzo's employment and do not rise to the level of a non-trivial, materially

adverse action that would deter a reasonable employee from consultation with the DMEEO. *See*

*id.* at 928; *Burlington*, 548 U.S. at 68. Similarly, Marrazzo's reassignment to the walk-in clinic,

which involved no  decrease in wage or salary, no less distinguished title, no loss of benefits, and

no significant diminishment of material responsibilities cannot reasonably be categorized as

materially adverse, and likewise cannot support a *prima facie* retaliation claim. *See Brooks*, 229

F.3d at 928; *Burlington*, 548 U.S. at 68.

Moreover, even were there a question of fact as to whether the denials of Marrazzo's

requests to work in an outside setting or the reassignment to the walk-in clinic could constitute

materially adverse employment actions, Marrazzo offers no direct evidence that the defendant

acted with a discriminatory motive, the Secretary has met its burden to proffer a

nondiscriminatory reason for each of these actions – specifically, the Secretary has offered

evidence tending to show that Marrazzo's requests for permission to work outside the clinic were

denied because Marrazzo had failed to successfully perform full time work for an extended period

without resort to medical or other leave even in the absence of outside work responsibilities, and

that Dr. Creelman had requested that Marrazzo be transferred out of the "team" nurse position

because her frequent absences made it difficult for him to guarantee the continuity of his patients'

care – and Marrazzo has not offered any evidence in support of her position that these proffered

reasons are pretextual.[3] Because Marrazzo has neither offered direct evidence of discrimination nor met her *McDonnell Douglas* burden to establish that the Secretary's proffered reasons are pretextual, her retaliation claim would fail as a matter of law even if the complained-of actions were sufficiently material to support her *prima facie* claim.

For the foregoing reasons, the Secretary's motion is granted as to Marrazzo's claim for violation of the Rehabilitation Act to the extent premised on alleged retaliation.

### D.    Disability Discrimination Theory

As noted above, I construe Marrazzo's allegation that the defendant retaliated against her for "being disabled" as a Rehabilitation Act claim for disability discrimination in the terms and conditions of her employment.  "To state a *prima facie* case [of employment discrimination] under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. United States Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007), *citing Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1058 (9th Cir. 2005).  For purposes of a disability discrimination claim, an adverse employment action is one  that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (modifications original), *quoting Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000).

---

[3] As to the charge of three hours twenty minutes' absence without leave, the Secretary offers evidence that Marrazzo failed to report for her shift without notice, whereas Marrazzo offers her testimony in support of her position that she did, in fact, provide notice that she would be absent from work.  Thus Marrazzo does offer evidence to rebut the Secretary's proffered nondiscriminatory reason for the unexcused absence charge, but as noted above, the three hours twenty minutes' absence without leave is not sufficient evidence of pretext to support a retaliation claim.

Under Title I, and therefore also under the Rehabilitation Act, disability is defined as:

(A)     a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)     a record of such an impairment; or

(C)     being regarded as having such an impairment

42 U.S.C. § 12102(1).  "Major life activities," in turn, include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).

Here, Marrazzo concedes that she did not at any material time have an actual disability, and argues that she was discriminated against because she was either regarded as disabled or because she had a record of disability.  To be disabled under the "regarded as" or "record of" prongs of the disability definition, a plaintiff must be regarded as having, or have a record of, a "substantial impairment" in "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, [or] working," 42 U.S.C. § 12102(2), or in a comparably important activity such as reproduction, *see Bragdon v. Abbott*, 524 U.S. 624, 638 (1998), that is of "central importance to daily life," *see Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 197 (2002) (construing a now-modified version of the ADA but still applicable to claims of discrimination taking place prior to 2008, *see Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009)).  The *Toyota Motor* court held, for example, that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely

restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Toyota Motor*, 534 U.S. at 198.

### 1. "Regarded As" Prong of the Definition of Disability

The courts require "that a plaintiff alleging a 'regarded as' claim provide evidence of the employer's 'misperception,' or subjective belief that the plaintiff is substantially impaired." *Walton*, 492 F.3d at 1006, *citing EEOC v. United Parcel Service, Inc.*, 306 F.3d 794, 805 (9th Cir. 2002). Moreover, the plaintiff must show that the employer regarded her as substantially limited in a major life activity rather than merely showing that the employer regarded her as unable to perform the duties of a particular job. *See Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 524 (1999). "If the plaintiff does not have direct evidence of the employer's subjective belief that the plaintiff is substantially limited in a major life activity, the plaintiff must further provide evidence that the impairment imputed to the plaintiff is, objectively, a substantially limiting impairment." *Walton*, 492 F.3d at 1006, *citing Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 798 (9th Cir. 2001).

In support of her argument that Warm Springs personnel subjectively regarded her as disabled, Marrazzo points to only two lines of evidence: the restrictions on administering injections and changing dressings that she was subjected to before her physician released her to work without restrictions, and the proposed realignment of her duties of July 2006, which Warm Springs contended was advisable on the ground that Marrazzo's frequent absences made her unable to provide the "consistency" necessary for "designated provider" care.

As a matter of law, it is clear that the temporary restrictions on administering injections

and changing dressings cannot support a "regarded as" disability discrimination claim.  Because

Warm Springs lifted those restrictions as soon as Marrazzo's physician cleared her to return to

work without restrictions, the restrictions cannot serve as evidence that Warm Springs regarded

Marrazzo as having any "permanent or long-term" impairment.  *Toyota Motor*, 534 U.S. at 198.

Because only an impairment perceived as permanent or long-term can support a "regarded as"

disability discrimination claim, the claim cannot survive on the evidence of the temporary

restrictions.

     The proposed realignment of Marrazzo's duties serves to support the conclusion that

Warm Springs personnel regarded Marrazzo as being frequently absent from work.  However,

because it is undisputed that Warm Springs did not seek to terminate Marrazzo's employment on

the basis of her frequent absences (or on any other basis), and instead sought to transfer her to a

clinical nursing position in which frequent absences from work would not create obstacles to the

effective provision of health care to Warm Springs' patients, it is not possible to reasonably infer

from the proposed realignment that Warm Springs personnel regarded Marrazzo's health condition

as substantially impairing her ability to perform the job duties of a clinical nurse, nor does the

proposed realignment constitute direct evidence that Warm Springs personnel regarded Marrazzo

as substantially impaired in any major life activity.

     Furthermore, the impairments Marrazzo alleges were imputed to her do not constitute

substantial impairments in any major life activity.  Marrazzo alleges that her lymphedema actually

impairs (or at material times impaired her) in connection with engaging in personal hygiene,

carrying weights greater than 10 pounds frequently, farm work, keyboarding, and writing.  In

addition, Marrazzo alleges that she is or was impaired in engaging in manual tasks and engaging

Page 21 - OPINION AND ORDER

in repetitive motion generally. Marrazzo does not allege that any impairments beyond the foregoing were ever imputed to her by Warm Springs personnel. Therefore, because Marrazzo concedes that she was not at any material time actually disabled, she necessarily likewise concedes that the impairments allegedly imputed to her were not substantially limiting impairments.

Because a trier of fact could not conclude on the basis of the evidence in the record that Marrazzo was regarded as disabled by Warm Springs personnel, the Secretary's motion is granted as to Marrazzo's claim for violation of the Rehabilitation Act to the extent premised on disability discrimination on a "regarded as" theory of disability.

### 2.    "Record of" Prong of the Definition of Disability

"[H]aving a 'record' of a disability means either having a history of, or having been misclassified as having, a substantially limiting impairment." *Walton*, 492 F.3d at 1011 (citations omitted); *see also* 29 C.F.R. § 1630.2(k). Marrazzo offers no evidence or argument that Warm Springs personnel ever misclassified her as having any long-term or permanent impairment greater than the impairments she actually experienced, nor does she offer evidence that she had a history of having any actually substantially limiting condition. She concedes that the impairments she actually suffered were not sufficiently limiting of any major life activity to constitute disabling conditions. It therefore necessarily follows that her record of impairment is not a record of disability. The Secretary's motion is granted as to Marrazzo's claim for violation of the Rehabilitation Act to the extent premised on disability discrimination on a "record of" theory of disability.

## CONCLUSION

For the reasons set forth above, the Secretary's motion (#17) for summary judgment is granted. A final judgment will be prepared.

Dated this 21st day of June, 2010.

Honorable Paul Papak
United States Magistrate Judge